1

2

3

4

5

6

7

8

9

10

11

12

13

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SYLVESTER JAMES MAHONE,

                    Plaintiff,

   v.

PIERCE COUNTY, PIERCE COUNTY
SHERIFF'S DEPARTMENT, PAUL
PASTOR, RICH ODEGARD, LT.
CHARLA JAMES, MARVIN
SPENCER, and MARTHA KERR,

                    Defendants.

NO. C10-5847  RBL/KLS

REPORT AND RECOMMENDATION
**Noted For:  June 10, 2011**

15

16

17

18

19

20

21

     Before the court is the motion for summary judgment of Defendant Pierce County

Corrections Lieutenant Charla James, with supporting declarations and exhibits.   ECF Nos.

16, 17 and 18.  Plaintiff Sylvester James Mahone filed a response (ECF No. 32) and

declaration (ECF No. 33) in opposition.[1]  Defendant James filed a reply (ECF No. 37) and

supplemental declaration (ECF No. 36).[2]  Having carefully reviewed the parties' pleadings,

supporting declarations, and balance of the record, and viewing the evidence in the light most

22

23

24

25

[1] Defendants object to Mr. Mahone's Declaration.   This issue is discussed fully below.

[2] Defendants also filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 15.  Plaintiff filed a response (ECF No. 29) and a motion to amend his complaint.  ECF No. 26.  In a separate Report and Recommendation, the undersigned recommends that the motion to dismiss be granted.  In a separate Order, the motion to amend has been denied.

26

REPORT AND RECOMMENDATION - 1

1   favorable to Mr. Mahone, the undersigned recommends that the Defendant James' motion for

2   summary judgment be granted.

3                                    **BACKGROUND**

4           Mr. Mahone filed this civil rights action in November 2010.  He alleges that Lt. James,

5   Pierce County, Sheriff Paul Pastor, Chief Martha Karr, Captain Marvin Spencer and Chaplain

6   Odegard all violated the Religious Land Use and Institutionalized Persons Act (RLUIPA), and

7   that all the Defendants (other than Sheriff Pastor) also violated the "Free Exercise Clause of the

8   First Amendment … Article I § 11, of the Washington Constitution," "Equal Protection and

9   Due Process Clause of the Fourteenth Amendment … And Article I § 3 of the Washington

10  Constitution."  ECF No. 4, pp. 3-4.

11          In his complaint, Mr. Mahone alleges generally that his rights were violated when he

12  was denied "his religious dietary need, i.e., Jewish Kosher Meals three times a day since May

13  2010," and that he is being discriminated against because he was not born Jewish.  ECF No. 4,

14  p. 3.  The complaint is largely silent as to which Defendants are alleged to have violated his

15  constitutional rights.  Attached to his complaint, however, are copies of the grievances Mr.

16  Mahone filed in 2010 at the Pierce County Detention and Correction Center (PCDCC).  These

17  grievances contain Lieutenant James' denial of Mr. Mahone's grievance requesting a "Jewish

18  Diet."  ECF No. 4, pp. 9-12.  As noted above, Defendants moved to dismiss Plaintiff's claims

19  for failure to state a claim under Rule 12(b)(6) and that motion is the subject of a separate

20

21

22

23

24

25

26  REPORT AND RECOMMENDATION - 2

1    Report and Recommendation.  Lieutenant James joined the motion to dismiss, in part, [3] and

2    also filed this motion for summary judgment on the grounds that she did not violate Mr.

3    Mahone's right to practice his religion.

**MOTION TO STRIKE**

4

5           Defendant James objects to Mr. Mahone's response and declaration (ECF Nos. 32 and

6    33) because they were not timely filed, they contain unsupported factual assertions and

7    assertions not based on personal knowledge, and because the declaration is not based on oath

8    or affirmation.  Mr. Mahone's response and declaration are dated March 31, 2011.  ECF Nos.

9    32 and 33.  Mr. Mahone was given an extension until March 28, 2011 to file his response.

10   ECF No. 28, p. 4.  In light of Mr. Mahone's *pro se* prisoner status, however, the court is not

11   inclined to strike his materials based on such a short delay.  In addition, whether the factual

12   statements contained in Mr. Mahone's responses are conclusory, based on subjective

13   perceptions, or are otherwise unsupported by admissible summary judgment evidence, they

14   shall not be considered in determining whether a genuine issue of material fact has been raised.

15          The lack of a satisfactory oath or affirmation is more problematic.  Although Mr.

16   Mahone wrote:  "I declare the truth of the facts herein pursuant to 28 U.S.C. § 1746," at the

17   end of his response and declaration (ECF No. 32, p. 32, p. 19; ECF No. 33, p. 3),[4] it is

18   questionable whether such language satisfies the requirements of 28 U.S.C. § 1746.  Section

---

[3] Lieutenant James joined in the Rule 12(b)(6) motion to dismiss for failure to state a claim Plaintiff's claims under 42 U.S.C. § 2000cc-1, the Fourteenth Amendment, Article I §§ 3 & 11 of the Washington Constitution, as well as dismissal of any requested injunction, declaratory judgment and lis pendens.  ECF No. 15.

[4] This is in contrast to the language used by Mr. Mahone in his complaint, where he wrote the words:  "I declare under penalty of perjury that the foregoing is true and correct."  ECF No. 4, p. 7.

REPORT AND RECOMMENDATION - 3

1746 requires that a declaration be subscribed as true under penalty of perjury, and be executed substantially in the statutory form, which in turn requires a declaration "*under penalty of perjury* that the foregoing is true and correct."  28 U.S.C. § 1746 (emphasis added).  Although a lack of swearing is not a fatal defect, the declaration must be made under penalty of perjury and must be attested to be true.  *Cobell v. Norton,* 310 F.Supp.2d 77, 84 (D.D.C. 2004) (statement of truth based on "knowledge, information and belief" insufficient); *Kersting v. United States,* 865 F.Supp. 669, 776-77 (D.Hawai'i 1994) (necessary elements are that the unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true.)

However, the Court again takes note of Mr. Mahone's *pro se* status and the fact that he did refer to 28 U.S.C. § 1746, perhaps in an effort to show compliance with its requirements.  Accordingly, the Court has considered the statements contained in the response and declaration for purposes of the summary judgment motion.  However, a party opposing summary judgment must still present "significant probative evidence tending to support the complaint" to defeat summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  As noted above, conclusory allegations or those based on subjective perceptions or that are otherwise unsupported by admissible summary judgment evidence are not considered "significant probative evidence."

## STATEMENT OF FACTS

Mr. Mahone states that he is an African American Hebrew adherent of Judaism and that he has been an "adherent of Judaism" since August of 2009.  ECF No. 33, p. 2.

REPORT AND RECOMMENDATION - 4

1       Prior to April 2010, Plaintiff Sylvester James Mahone had been incarcerated at the

2   PCDCC on ten previous occasions.   ECF No. 18, p. 2.   In a previous 2005 incarceration, Mr.

3   Mahone identified himself as a "Seventh Day Adventist" and had demanded "a Vegan Diet."

4   ECF No. 18, p. 6 (Exh. A).   Prior to May 10, 2010, Mr. Mahone had never identified himself

5   within the PCDCC as Jewish.   ECF No. 18, p. 1.[5]   On March 11, 2010, the week before he was

6   released from his first 2010 incarceration, Mr. Mahone had used his own funds to purchase

7   such non-Vegan and non-Kosher food items from the PCDCC commissary as "Sharp Cheddar

8   Cheese" and "Ramen-Texas Beef."   *Id.*, p. 2 and p. 8 (Exh. B); ECF No. 17, p. 2.

9       Mr. Mahone's second 2010 incarceration at the PCDCC, which is relevant here,

10  occurred between April 22, 2010, and November 16, 2010.   ECF No. 18, p. 2.   Mr. Mahone's

11  commissary purchases within days of this latest booking included non-Kosher food items such

12  as "Jalapeno Cheese."   *Id.*, p. 2 and pp. 8-10 (Exh. B).

13      Mr. Mahone admits that he purchased non-kosher items from the commissary, but

14  states that he bought these items to pay off the "violent street gang called the Hilltop Crip

15  Gang to keep them from physically assaulting and/or raping" him.   ECF No. 33, p. 3.   He also

16  states that he was placed in disciplinary segregation for possession of a large shank, which he

17  had only for protection "from these thugs," and that he told "PCDCC officials" about this.   *Id.*

18      On May 10, 2010, 18 days following the commencement of his second 2010

19  incarceration, Mr. Mahone complained to a Correctional Officer of a hair in his food.   ECF No.

---

[5] Mr. Mahone is presently incarcerated at the Washington State Penitentiary (WSP).  He claims that since his return to prison, he has been receiving his kosher diet and "religious studies."  ECF No. 33, p. 3.  Whether Mr. Mahone satisfied the requirements of the WSP to receive a kosher diet is not relevant to the Court's determination of whether Defendant James violated his constitutional rights during his incarceration at the PCDCC.

REPORT AND RECOMMENDATION - 5

18, p. 2.  On that same day, he sent a kite to PCDCC staff stating that he was "of the Jewish faith" and wanted "a 'Jewish Diet' and a 'Torrah' [sic] please."  *Id.*, p. 2 and p. 16 (Exh. C).  Mr. Mahone was provided with a "Jewish Prisoner Services International: Prisoner Information."  On the form, Mr. Mahone indicated that his father, Israel James Mahone, was Jewish and that his mother Ezera Boone converted to Judaism.  Mr. Mahone responded with "N/A" to questions regarding his synagogue affiliation and location and rabbi's name.   He also indicated that the "Torrah" [sic] was the source of his Jewish education.  *Id*. at 2 and p. 17 (Exh. D).  On May 13, 2010, PCDCC Chaplain Rich Odegard responded in writing to Mr. Mahone stating:

> Thank you for returning the information form.  However, there are no contact numbers given to verify the claim of being Jewish.  Inasmuch as the kosher diet is a much more complicated diet/life style, we are required to determine the appropriate response in accordance to Jewish law.  Please return to us the name(s) of a synagogue, rabbi, family member(s) etc. that can give us the needed information.
>           Thanks for your help.

ECF No. 18, p. 18 (Exh. E).

On May 15, 2010, Mr. Mahone filed a Grievance demanding "my Jewish Kosher Diet for all three meals."  Two days later, Chaplain Odegard responded to the grievance and stated that the PCDCC had "neither approved nor denied" the request because Mr. Mahone had provided "inadequate information … to process this request."  However, while "in process, we have placed a 'no pork' label for Food Service even though no pork or other food considered unclean per Torah is served."  *Id*. at 3 and p. 19 (Exh. F).  Chaplain Odegard also wrote Mr. Mahone a separate personal note explaining that the PCDCC has "provided Kosher diets to

REPORT AND RECOMMENDATION - 6

Jewish adherents of multiple nationalities & ethnic origins" but it could "neither approve or deny without appropriate information to verify your Jewish claims." *Id*. at 3 and p. 21 (Exh. G).

In his response, Mr. Mahone states that because Defendants' refused to provide him with a kosher meal, he was forced to "defile his body" with non-kosher foods forbidden by his Judaic faith.  ECF No. 32, p. 3.

On May 26, 2010, Mr. Mahone returned a second "Jewish Prisoner Services International, Prisoner Information" form.  ECF No. 18, p. 22 (Exh. H).  On this form, Mr. Mahone again failed to list any synagogue affiliation or rabbi name.  On this form, he correctly spelled "Torah," but he misspelled "Isreal," which he claims as his Hebrew name and also that of his father, even though he spelled it as "Israel" on his previous form.  *Id.* and p. 17 (Exh. D). He also spelled his mother's Hebrew name as "Ezzarh," although in the previous form, he spelled her name as "Ezera."  *Id.*  He wrote on the form that he and his family are "African Americans – thus African Jews original Isrealites [sic]."  ECF No. 18, p. 22 (Exh. H).

On June 11, 2006, Mr. Mahone appealed his grievance, stating:  "I Now Choose To Worship Judaism" and "don't have any more information to give."  ECF No. 18, p. 24 (Exh. I). Two weeks later, Mr. Mahone stated in a grievance appeal that "I just want to practice my Jewish Faith in private and in full, *as I did in society prior to coming to jail.*"  ECF No. 18, p. 20 (Exh. F) (emphasis added).

Prior to Mr. Mahone's May 2010 request for a "Jewish Diet," during the period he was pursuing that request, and after it was expressly denied, he continued to voluntarily purchase

REPORT AND RECOMMENDATION - 7

1    food items that were identified as not being kosher, such as "Ramen Hot and Spicy Vegetable,"

2    "Ramen Chili," and "Sharp Cheddar Cheese."   ECF No. 17, p. 2.

3        On June 22, 2010, Rabbi Gary Friedman, who serves as a Jewish Chaplain for the

4    PCDCC, contacted Rabbi Shneur Huber to speak with Mr. Mahone and to assist PCDCC

5    officials in determining the sincerity of Mr. Mahone's assertion that his Jewish faith required

6    he be provided a "Jewish Diet" three times a day.  ECF No. 17, pp. 1-2.

7

8        Rabbi Huber met with Mr. Mahone at the PCDCC and told him the reason for his visit.

9    *Id.*, p. 2.  Mr. Mahone could not confirm that his parents had ever been Jewish, that he had

10   been raised in the Jewish faith, ever attended a synagogue, or ever been instructed in Judaism.

11   In fact, according to Rabbi Huber, Mr. Mahone knew very little about Judaism.  During their

12   conversation, Mr. Mahone demonstrated an interest in what he thought he understood about

13   Jewish customs, but Rabbi Huber concluded that Mr. Mahone's request for a "Jewish Diet"

14   was something Mr. Mahone had recently decided for other non-religious reasons.  *Id.*

15

16       Rabbi Huber reviewed documentation of Mr. Mahone's commissary purchases while at

17   the PCDCC before, during and after Mr. Mahone's request for a "Jewish Diet."  Rabbi Huber

18   went to the PCDCC Commissary and examined each of the products purchased by Mr. Mahon

19   that were listed on the Commissary menu as not being kosher.  He was able to confirm from

20   his physical examination of each of the products that Mr. Mahone purchased before, during

21   and after his request for kosher meals were, in fact, shown by the menu and packaging to not

22   be kosher, *i.e.* items such as jalapeno cheese, sharp cheddar cheese, Ramen-Texas beef, Ramen

23   Hot and Spicy Vegetable, and Ramen Chili.  *Id.*

24

25

26   REPORT AND RECOMMENDATION - 8

Rabbi Huber concluded that because Mr. Mahone was not familiar with the Jewish religion, he could not have a sincerely held religious belief in the religion.  He reported this conclusion to Lt. James.  ECF No. 18, p. 4.  Lt. James states that on June 25, 2010, based on all the facts available to her at that time, she denied Mr. Mahone's request for a kosher diet.  *Id.*, pp. 4 and 24.  According to Lt. James, the information that was obtained from Mr. Mahone concerning his request for a "Jewish Diet" made clear to her that he was not being truthful about the claimed religious basis for his request.  ECF No. 18, p. 4.

Mr. Mahone explains that he made errors on the Prisoner Information forms because he "rushed" through completing the forms.  ECF No. 32, p. 5.  He also claims that he "sincerely believes that maintaining a Kosher Diet is required of adherents of Judaism to maintain a strong spirituality and purity of the mind, body, and soul to prevent Plaintiff's soul from peril and inifinit [sic] damnation."  ECF No. 32, p. 5.

Lt. James states that her conclusion that Mr. Mahone lacked a sincere religious belief in the need for a kosher diet was further confirmed by Mr. Mahone's recorded telephone conversation with his mother on the day after Lt. James denied his request.   A copy of the transcript of Mr. Mahone's June 26, 2010 recorded telephone conversation with his mother is attached to Lt. James' declaration and states, in part:

> Mahone:     I want to file a lawsuit.  They're denying me a religious diet, and they can't do that.
>
> Female:     *What kind you wanted?*
>
> Mahone:     *A Jewish diet.*
>
> Female:     *Why?*

REPORT AND RECOMMENDATION - 9

| Mahone: | *Because it's, uh, part of my religion.* |
|---------|-------------------------------------------|
| Female: | *Jewish?* |
| Mahone: | Well I can't really talk over the phone, because they record it. |
| Female: | Oh.  Yeah. |
| Mahone: | But, uh, one, uh, the other good reason is that, uh, is that, uh, it's, it's pure, fresh.  It's not spit in and all that stuff like jail food is and stuff too. |
| Female: | It's not what? |
| Mahone: | It's not spit in, in, in … |
| Female: | How you know? |
| Mahone: | …hair all over it and stuff like that.  Because it comes in from a, a place way out by *the Jews and they* make sure *their* stuff is real … |
| Female: | Kosher. |

ECF No. 18, p. 32 (Exh. J) (emphasis added).

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  *Playboy Enterprises, Inc. v. Netscape Communications Corp*., 354 F.3d 1020, 1023-24 (9th Cir. 2004).  A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its

REPORT AND RECOMMENDATION - 10

affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the nonmoving party is pro se, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct."  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

On summary judgment, a court must view all evidence and any inferences therefrom in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996) (citation omitted).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  The Court "need not examine the entire file for

REPORT AND RECOMMENDATION - 11

1    evidence establishing a genuine issue of fact, where the evidence is not set forth in the

2    opposing papers with adequate references so that it could conveniently be found." *Carmen v.*

3    *San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even

4    when a party appears pro se.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).  A court

5    construes a pro se plaintiff's pleadings liberally.  *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th

6    Cir. 2005).

7

8                                          **DISCUSSION**

9    **A.     First Amendment and RLUIPA Claims**

10           Mr. Mahone makes his claims under both the First Amendment and the Religious Land

11   Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* (2000 ed).  RLUIPA.  The

12   Free Exercise Clause of the First Amendment provides that "Congress shall make no law

13   respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const.

14   Amend. I.  Only beliefs which are both "sincerely held" and "religious in nature" are protected

15   under the First Amendment.  *DeHart v. Horn*, 227 F.3d 47, 52 (3rd Cir. 2000).  To show a free

16   exercise burden that is unconstitutional, a litigant must do more than merely show the

17   government action in some way affected his religion.  *Lyng v. Northwest Indian Cemetery*

18   *Protective Ass'n.*, 485 U.S. 439, 108 S. Ct. 1319, 99 L.Ed.2d 534 (1988).  A plaintiff must

19   prove the governmental act burdens the adherent's practice of his religion by pressuring him

20   (1) to commit an act forbidden by the religion, or (2) by preventing him from engaging in

21

22   conduct or having a religious experience which the faith mandates.  *Graham v. C.I.R.*, 822 F.2d

23   844, 850-51 (9th Cir.1987), *aff'd sub nom. Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136,

24

25

26   REPORT AND RECOMMENDATION - 12

1   104 L.Ed.2d 766 (1989).  The interference must be more than an inconvenience; the burden

2   must be substantial and an interference with a tenet or belief that is central to religious

3   doctrine.  *Id*.

4        Under RLUIPA, plaintiff "bears the initial burden of going forward with evidence to

5   demonstrate a prima facie claim that the challenged state action constitutes a substantial burden

6   on the exercise of his religious beliefs."  *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir.

7   2005) (citing *Cutter*, 125 S. Ct. at 2119).  "[A] burden is substantial under RLUIPA when the

8   state denies [an important benefit] because of conduct mandated by religious belief, thereby

9   putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."

10  *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. Jan. 23, 2008) (internal quotes omitted).  A

11  prison's "accommodation of religious observances" should not be elevated "over an

12  institution's need to maintain order and safety."  *Cutter v. Wilkinson*, 544 U.S. 709, 722, 125 S.

13  Ct. 2113 (2005).  On the contrary, "an accommodation must be measured so that it does not

14  override other significant interests."  *Id.*  Furthermore, "prison security is a compelling state

15  interest, and … deference is due to institutional officials' expertise in this area."  *Id.* at 2124

16  n.13.

17       The issue here is whether it was appropriate for Defendant James to deny Mr.

18  Mahone's request for kosher meals based on a determination that his beliefs were not truly

19  held.  The issue here is very clearly set forth in *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13

20  (2005):

21       …Although RLUIPA bars inquiry into whether a particular belief or practice is
22       "central" to a prisoner's religion, see 42 U.S.C. 2000cc-5(7)(A), the Act does

26  REPORT AND RECOMMENDATION - 13

not preclude inquiry into the sincerity of a prisoner's professed religiosity. Cf. *Gillette v. United States,* 402 U.S. 437, 457, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) ("[T]ruth" of a belief is not open to question; rather, the question is whether the objector's beliefs are 'truly held.'" (quoting *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)).

*Cutter, supra; See also, McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir.1987) (It is "appropriate for prison authorities to deny a special diet if an inmate is not sincere in his religious beliefs.")

      Mr. Mahone states that he sincerely believes that eating kosher foods is required of adherents of Judaism.   The Court is not permitted to focus on whether an "adherent of Judaism" must eat kosher foods.  The proper focus is on whether Mr. Mahone is sincere in his profession that he is Jewish.  It was not inappropriate for Defendant James to inquire into the sincerity of Mr. Mahone's belief or, after doing so, denying his request based on information he himself supplied.  The record reflects that he did not profess to be of the Jewish faith in his previous ten PCDCC incarcerations; he did not profess to be of the Jewish faith during the relevant period of incarceration until weeks after his booking and around the time he expressed concern about finding a hair in his food; and, he provided no evidence that he ever practiced the Jewish faith "as he did in society" before being incarcerated.  The prison forms he completed and his conversation with a Rabbi confirmed that he has no Jewish heritage, no Rabbi, no instruction in Judaism, is not affiliated with any synagogue and knows very little about Judaism.  More telling, he referred to Jews in the third person when talking with his mother – "… it comes in from a, a place way out by *the Jews and they* make sure *their* stuff is real …".  ECF No. 18, p. 32 (Exh. J).  This is in stark contrast to the information supplied by

REPORT AND RECOMMENDATION - 14

Mr. Mahone to prison authorities that his father was Jewish and that his mother was a convert to Judaism with the name of either "Ezzarh" or "Ezera".  Mr. Mahone's explanation that he was restrained from speaking freely during his telephone conversation with his mother because he knew the conversation was being recorded is of no help.  This does not explain why he would not want to discuss his Jewish faith with his allegedly Jewish mother.  It also does not explain why his allegedly Jewish mother would question why he wanted "Jewish" food.

While Mr. Mahone claims that he "became Jewish in August of 2009", he does not deny that he was incarcerated after August 2009, and it was not until May of 2010 that he first claimed in PCDCC to be Jewish when he stated "I Now Choose To Worship Judaism."   ECF No. 18, p. 24 (Exh. I).

Moreover, it is undisputed that while Mr. Mahone's request for kosher meals was being looked into by prison officials, Mr. Mahone was not fed pork even though "no pork or other food considered unclean per Torah is served" at the PCDCC even in non-kosher meals.  ECF No. 18, p. 3; p. 19 (Exh. F).   Even though Mr. Mahone was advised that he was being served food that was not considered "unclean per Torah," he continued to purchase non-kosher items from the commissary.  Although Mr. Mahone claims that he used these purchases to pay off gang members in the jail (ECF No. 33, p. 3), there is no evidence that he made any complaint to prison officials that he was being exploited by gang members.  According to Lt. James, who spoke with Mr. Mahone at length, he never mentioned a fear of gang members and said only that he did not like to be around gang members because he found them to be childish and immature.  ECF No. 36, pp. 1-2.  In addition, the only complaint mentioning Mr. Mahone's

REPORT AND RECOMMENDATION - 15

1   commissary items is when he objected that they had not followed him after he had been moved

2   to another cell while in segregation.  According to Lt. James, while in segregation, Mr.

3   Mahone would have had no contact with gang members and gang members would not have

4   been able to threaten him or receive bribes of non-kosher food.  ECF No. 36, p. 2.  It is also

5   unclear to this Court why the alleged bribes could not have been satisfied with kosher food

6   items which were also available for purchase at the PCDCC commissary.  *See* ECF NO. 18, p.

7   11 (2010 Commissary Menu denoting Kosher items).

8

9        In addition to receiving no pork or other food considered unclean per Torah, there is no

10  evidence that Mr. Mahone was deprived of all forms of religious exercise and no evidence that

11  he could not freely observe other religious obligations.  *See, e.g., O'Lone v. Estate of Shabazz*,

12  482 U.S. 342, 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley*, 482 U.S. 78, 90,

13  107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see, e.g., Baranowski v. Hart*, 486 F.3d 112, 120 (5th

14  Cir.2007) (the denial of a kosher diet does not violate an inmate's First Amendment rights to

15  free exercise where other forms of religious exercise are available).  In fact, there is no

16  evidence that Mr. Mahone has ever engaged in the practices and tenets of Judaism other than

17  his stated belief that he must eat kosher foods.  The undisputed facts establish that Mr. Mahone

18  did not profess to be of the Jewish faith until May 2010, during his tenth stay at the PCDCC.

19  There is no evidence that Plaintiff attended Jewish services, observed Jewish holidays, or

20  otherwise engaged in the practice of Judaism while he was incarcerated at the PCDCC.

21

22

23        The undersigned finds that the overwhelming evidence shows that it was appropriate

24  for Defendant James to deny Mr. Mahone's request for kosher meals based on a determination

25

26  REPORT AND RECOMMENDATION - 16

that his belief in Judaism were not truly held.  Because Mr. Mahone's request for kosher foods

was not based on a sincerely held religious belief, the court need not reach the question of

whether a legitimate and reasonably exercised state interest outweighs the preferred First

Amendment Claim.  *See, e.g., DeHart*, 227 F.3d 47, 51-52 (citing *Turner v. Safely*, 482 U.S.

78, 89, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987).  As explained in *DeHart,*"[t]he *Turner* analysis

is appropriate only in cases where a prison policy is impinging on inmates' constitutional

rights.  *Turner*, thus, assumes as a predicate that the plaintiff inmate has demonstrated that a

constitutionally protected interest is at stake."   If a prisoner's request for a particular diet is not

the result of sincerely held religious beliefs, there is no First Amendment obligation on the

prison to honor that request, and there is no occasion to conduct the *Turner* inquiry.  It is in this

way that prisons are protected from random requests for special diets by inmates whose alleged

dietary restrictions are not the result of their religious convictions but rather their secular

predilections.  *DeHart,* 227 F.3d at 51-52.  "Prison officials are, of course, entitled both to

make a judgment about the sincerity and religious nature of an inmate's belief when he or she

asks for different treatment and to act in accordance with that judgment.  If the request is not a

constituent part of a larger pattern of religious observance on the part of the inmate, for

example, the asserted religious basis for the request may be rejected as pretext."  *Id.*, Fn3.

  Similarly under RLUIPA, the plaintiff bears the initial burden of going forward with

evidence to demonstrate a prima facie claim that the challenged state action constitutes a

burden on the exercise of his religious belief.  *Warsoldier,* 418 F.3d at 994.  It is only after the

plaintiff has established a substantial burden that the defendants must prove that the burden

REPORT AND RECOMMENDATION - 17

1    both furthers a compelling government interest and is the least restrictive means of achieving

2    that interest.  *Id.* at 995.

3            The record reflects that Defendants denied Plaintiff's request for a "Jewish Diet" only

4    after he acknowledged in prison forms that he was not affiliated with a synagogue, had no

5    rabbi, and was not able to provide any contact numbers to verify the claim of being Jewish.

6    Even then prison officials did not deny his request outright, but provided Mr. Mahone

7    additional opportunity to provide the requested information and arranged for him to confer

8    with a Rabbi.  However, during that conversation, Mr. Mahone confirmed that he had not been

9    raised in the Jewish faith, had never attended a synagogue, had never been instructed in

10   Judaism, and knew very little about Judaism as a religion.   Under these circumstances, his

11   allegation now that he is Jewish does not create an issue of fact as to whether Defendant James

12   acted unreasonably in rejecting his request for a "Jewish Diet."

13           Based on the record before it, the court finds summary judgment on Mr. Mahone's First

14   Amendment and RLUIPA claims to be appropriate.  *See e.g. Abrams v. Church*, 2008 WL

15   426501, * 11 (E.D. Wash. 2008) (not reported in F.Supp.2d)(granting summary judgment on

16   prisoner's First Amendment claim because county jail officials "reasonably denied Plaintiff's

17   requests for kosher meals after reviewing" past records of incarceration "and finding no

18   evidence of past religious preference, affiliation, or activity") (*quoting McElyea v. Babbitt*, 833

19   F.2d 196, 198 (9th Cir. 1987)).  *Lawson*, supra. at * 3 (prisoner's free exercise and § 2000cc-1

20   claims dismissed and sanctions imposed because fact plaintiff "never attends morning Jewish

REPORT AND RECOMMENDATION - 18

prayer services, has declined a proffered work release, and eats non-Kosher foods" showing

"religious insincerity").

As noted above, Defendant James also joined in Defendants' Rule 12(b)(6) motion to

dismiss and incorporates in her motion for summary judgment, the additional argument that no

§ 2000cc-1 claim can be made against her because that statute does not apply to individually

named defendants.  ECF No. 16, p. 7 n.2.  This issue is addressed in the separate Report and

Recommendation on Defendants' motion to dismiss.

**B.      Violation of Equal Protection**

Mr. Mahone alleges that the Defendants discriminated against him "on the basis of

'race and religion' in the areas of religious diet accommodations and not being Jewish born."

ECF No. 4, p. 3.   He further asserts, without evidentiary support, that he is being treated

"differently than WHITE SKINNED ADHERENTS OF JUDIASIM."  ECF No. 32, pp. 15-16.

"The Equal Protection Clause requires the State to treat all similarly situated people

equally."  *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (*citing City of Cleburne v.*

*Cleburne Living Center*, 473 U.S. 432, 439 (1985).  "[T]he Equal Protection Clause entitles

each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity

afforded fellow prisoners who adhere to conventional religious precepts.'"  *Id.* (*quoting Cruz v.*

*Beto*, 405 U.S. 319, 322 (1972)).  To succeed on an equal protection claim, a plaintiff in a

section 1983 claim must show that officials intentionally acted in a discriminatory manner.

*See Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds as*

*stated in Shakur,* 514 F.3d at 884-85.

REPORT AND RECOMMENDATION - 19

However, Mr. Mahone provides no more than the conclusory statement that "white skinned adherents" to Judaism were given a kosher diet when he was not because he is not white skinned or Jewish born.  There is no evidence, however, that Mr. Mahone is similarly situated to inmates who are allowed to receive kosher meals because of a sincerely held religious belief .  There is also no evidence, for example, that Defendant James previously granted a white inmate's request for a religious diet after he failed to provide information relating to his religious affiliation.

Viewing the evidence in the light most favorable to Mr. Mahone, the undersigned concludes that Mr. Mahone has failed to raise a question of material fact relating to his claim that Defendant James violated his right to equal protection and Defendant James' motion for summary judgment on this claim should be granted.

**C.     Due Process**

Mr. Mahone alleges "violation of the Due Process Clause of the Fourteenth Amendment" to the United States and Washington Constitutions.  ECF No. 4, p. 3.  He does not, however, allege or provide evidence to show how his due process rights were violated.  To the extent Mr. Mahone was attempting to raise a substantive due process claim, the gravamen of his claim that Defendants interfered with his ability to freely exercise his religion has been dealt with under the First Amendment.  *See Armendariz v. Penman,* 75 F.3d 1311, 1319 (9th Cir. 1996)(*quoting Albright v. Oliver,* 510 U.S. 266, 273 (1994)) (when particular amendment provides explicit textual source of constitutional protection against a particular government

REPORT AND RECOMMENDATION - 20

behavior, that amendment and not the more generalized notion of "substantive due process" must be the guide for analyzing these claims).

The Due Process Clause protects prisoners from being deprived of liberty without due process of law.  *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, to state a cause of action for deprivation of due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought.  *Sandin v. Conner*, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).  Here, Mr. Mahone has failed to demonstrate that a constitutionally protected interest is at stake.  Moreover, it is undisputed that Mr. Mahone was given notice and opportunities to be heard through repeated requests for additional information regarding his religious beliefs, the grievance process, and even an interview with an outside Rabbi.

Accordingly, the undersigned finds that Defendant James' motion for summary judgment on Mr. Mahone's Fourteenth Amendment due process claims is appropriate and recommends that the claims be dismissed with prejudice.

**D.     Qualified Immunity**

Defendant James also moves for summary judgment on the grounds that she is entitled to qualified immunity.  Because the court finds that Mr. Mahone has failed to raise a genuine issue of material fact that his constitutional rights have been violated, this issue need not be addressed.

REPORT AND RECOMMENDATION - 21

**CONCLUSION**

The undersigned recommends that Defendant James' motion for summary judgment (ECF No. 16) be **GRANTED** and that Mr. Mahone's claims against Defendant James be **Dismissed with Prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **June 10, 2011**, as noted in the caption.


**DATED** this 24th day of May, 2011.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 22